**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEANNE SAMMOND, PhD

    Plaintiff,

v.

ALLIANCE FOR SUSTAINABLE ENERGY, LLC

    Defendant.

**COMPLAINT**

Deanne Sammond, through her attorney, Paul Maxon, brings this lawsuit for sex discrimination and retaliation. Her allegations are as follows:

**JURISDICTION AND VENUE**

1. Plaintiff Deanne Sammond is a Colorado resident who lives in Boulder, Colorado. At all relevant times, she was a resident of this state.

2. Defendant is a Delaware corporation that regularly conducts business within the State of Colorado, with offices in the City of Golden.

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332 and 1343, and this action is authorized and instituted pursuant to 29 U.S.C. § 626(c).

4. Venue is proper in this Court as the unlawful employment practices alleged were committed within the jurisdiction of the United States District Court for the District of Colorado.

**FACTUAL ALLEGATIONS**

**Mr. Himmel's Pattern of Discrimination Against Female Scientists**

1. During the last decade, Mike Himmel, Dr. Sammond's former supervisor, engaged in a pattern of refusal to promote qualified female scientists. One of those scientists was Dr. Tina Jeoh, who worked under Himmel from approximately 2003-07. Under his supervision, Dr. Jeoh was repeatedly passed over for advancement and was forced to leave her position after she complained of discrimination by him. After Defendant forced her out, she earned a major award from the National Science Foundation, tenure at UC Davis, and the UC Davis Chancellor's≠ Fellow Award. Similarly, Stephanie Porter, who also worked under Himmel during that timeframe, also saw her career advancement stymied by him, and was passed over for favorable assignments in favor of male scientists. She too was also forced out after complaining about Himmel's discriminatory treatment of women. After leaving Defendant, she, just like Dr. Jeoh, saw her career flourish, becoming head of a research group.

2. In 2010, perhaps due to the exodus of talented female scientists such as Dr. Jeoh and Dr. Porter, Defendant was seeking to hire a post-doctoral researcher with experience working with Rosetta, a piece of software that is used for computational modeling and protein design. According to the job requisition, this researcher was to work under Mr. Himmel.

3. On October 11, 2010, Dr. Sammond, who had recently earned her PhD and completed two years as a postdoctoral researcher, but was unaware of

Himmel's history with female scientists, applied for Defendant's open position, listing her experience with Rosetta as one of her qualifications. In December 2010, Defendant offered her the job, which she accepted. In her new position her "research…predominately involved Rosetta Design modeling."

4. In January 2011, Mr. Himmel began supervising Dr. Sammond. In the fall of that same year, because federal regulations limit the amount of time a scientist can work as a post-doctoral researcher, Defendant was required to hire her full time at the entry-level Scientist III Position. This mandatory promotion would be the last that Defendant would allow to her receive.

5. Despite Himmel's refusal to promote her, Dr. Sammond's performance for the next four years was strong. In 2012, Himmel gave her an overall rating of "Meets Expectations," on her performance review. In 2013 and 2014, he gave her an overall rating of "Successful." In 2015 he found that she "Successfully meets expectations." And in 2016, he found that she "Successfully meets or exceeds expectations."

6. In each of these performance reviews, Dr. Sammond's work with Rosetta was repeatedly mentioned as a basis for her success. For example, her 2014 review mentioned her Rosetta work six times, with Himmel naming Rosetta as one of her "core strengths." In 2016, the last year before she formally complained about discrimination, Himmel wrote that Dr. Sammond's Rosetta modeling work "is on the cusp of establishing NREL as a leading lab in this kind of work…I strongly encourage her to continue these efforts in this area."

7. Consistent with these strong performance reviews from 2012-16, Dr. Sammond had numerous publications, presentations, and awards, as well as being selected to the Board of the Rosetta Commons.

8. Although she performed well from 2012-16, Himmel refused to promote her or otherwise advance her career, just as he had done with Drs. Jeoh and Porter before her. Instead, even though his performance reviews stated that she was "on the cusp of establishing NREL as a leading lab" in her area, he would sabotage her career advancement for the benefit of his male subordinates. As examples, he limited her lab access and undermined her work with the AdhE protein.

9. Not surprisingly, the male contemporaries of Dr. Sammond who worked under Himmel saw their careers advance while hers was undermined. Petri (Markus) Alahuhta earned his PhD in 2008, the same year as Dr. Sammond. Under Himmel, he was promoted to Scientist IV, and was given interns and stable funding, neither of which were given to her by Defendant.[1] Venkataraman Subramanian also works under Himmel, and also received his PhD in 2008. He has also been promoted to Scientist IV, a promotion she never received. Ashutosh Mittal received his PhD in 2007, only one year before Dr. Sammond. He was promoted to Scientist IV four years ago, while Defendant has prevented her from advancing. Todd VanderWall earned his PhD in 2018, ten years after Dr. Sammond. Nevertheless, he holds the same Scientist III position that she does.

---

[1] When Dr. Sammond did have interns, it was because she found them on her own.

10. After observing these disparities and learning about the experiences of Doctors Jeoh and Porter, Dr. Sammond came to understand that Himmel engaged in an ongoing pattern of preferring male scientists. However, when she brought her concerns about lack of advancement to him, he responded that there is nothing she could do that his protégé Yannick Bomble could not. He made this comment despite the fact that she is a protein engineer and Bomble is not.

## Defendant's Retaliation

11. In late 2016, frustrated with her lack of advancement, Dr. Sammond brought her concerns about Himmel to her center director. Afterward, she was excluded from meetings, including being excluded from lab meetings for months on end. She was also excluded from meetings for a Fed Impact project which Himmel and Bomble had used her resume to obtain funds for. Additionally, her male colleagues began taking her ideas from her, including the AdhE project that had been listed on her previous performance review as one of her major objectives.

12. In 2017, because of Himmel's marginalization of her, Dr. Sammond requested a reorganization in hopes that she would no longer have to work under him. This request was difficult not only because he supervised her work, but also because he and Bomble controlled her funding. Nevertheless, she pressed forward, and in September of that year, a reorganization was announced, resulting in a what was in effect a demotion for Himmel.

13. Days after the reorganization was announced, Defendant sent senior researchers showing that Dr. Sammond was the only researcher without significant funding for the coming year. This email was sent despite Himmel's statement in previous year's performance review that she was "on the cusp of establishing NREL as a leading lab" in her area of expertise. When she confronted Himmel about the lack of funding, he recommended that she resign. After he made this statement, she took her concerns to Mike Crowley, a friend of Himmel's. He also suggested she should resign.

14. On October 7, 2017, in response to Himmel's actions, Dr. Sammond formally complained to Defendant about his discriminatory and retaliatory actions, as well as those of his protégé Bomble. Included in her complaint was a formal request that she no longer be required to work under the supervision of either, and that Defendant establish clear goals that would help her to advance.

15. On November 20, 2017, Dr. Sammond participated in an investigation of her complaint through an interview with Defendant's investigator. On December 1, only eleven days later, Himmel wrote his first ever negative performance review of her.

16. Himmel's retaliatory 2017 review included negative feedback for the same work that he had praised her for in previous years. For example, in 2016, regarding her work on the PDC protein, he had written, "I am particularly impressed with her technical acumen in developing new modeling paradigms on the PDC…" However, in 2017 he reversed course and claimed that her PDC work was inadequate and any credit should go to a male scientist, writing, "[r]egarding

6

the PDC fusion work, the claims are essentially inaccurate. Daehwan [a male scientist] developed this concept initially…"[2] Similarly, the 2016 review had addressed her work on PFOR proteins, which had apparently contributed to Himmel's finding that she had "a very good year in FY16." But in the 2017 review Himmel criticized her for not finishing work on PFORs in *2016*, despite the fact that this was a project from the previous year, and he had not previously claimed her work was deficient. Similarly, her 2016 review addressed her work on the AdhE protein, which Himmel ostensibly considered when he found that she "exceeded expectations in several projects" that year. Indeed, in 2016 AdhE was important enough to merit its own heading on her review, and in that review he did not state any dissatisfaction with her progress. But in her 2017 review, he reversed his previous assessment of her 2016 AdhE work, writing that "Deanne hadn't done anything [on AdhE] as of March FY16."

17. In addition to criticizing her for work he had previously praised her for, Himmel's 2017 review criticized her for not completing tasks that Defendant had continually refused to support her on. He criticized her for not completing work on xylose transporter (a protein) claiming that "all the materials were available." In fact, the work was not completed because Defendant repeatedly ignored her requests to provide her with the materials necessary to complete it.

18. On December 6, through a letter from her attorney, Dr. Sammond complained to Defendant that Himmel's 2017 review was inaccurate and retaliatory. In

---

[2] PDC modeling and fusion are not identical projects, but in addition to involving the same protein, the second project was a follow-up on the first.

response, Defendant assigned Michael Crowley to present the review, along with another supervisor, Steve Decker, who had no personal knowledge of the review's substance. Although Defendant assigned the in-person presentation of Himmel's review to other supervisors, its substance was not changed.

19. On December 21, 2017, Dr. Sammond met with Crowley and Decker to discuss Himmel's review. Repeatedly during the meeting, she provided the reviewers with specific refutation of Himmel's claims, but they were not able to substantively respond. Based on their lack of substantive response, she repeatedly voiced concern that the review's false claims were fabricated to make her look bad, but neither Mr. Decker nor Mr. Crowley responded to this concern. When she informed them that she had relayed her concerns to the legal department, Mr. Crowley said, "This is like a he said she said." Then he began laughing and continued, "How can you come in here with that?"

20. The review became even more remarkable when the discussion turned to Himmel's claim that Dr. Sammond had not met her goals working on the xylose transporter, and his claim that "all the materials were available." Dr. Sammond responded by explaining that she had repeatedly requested the materials but received no response. Decker was skeptical, asking, "What were they expecting you to do on the project?" He continued, "There has to be supplies…people never balk about that…I can't imagine anyone balking at a few thousand dollars [for supplies]…" After several minutes of Decker's questioning, Crowley jumped in and said, "You should have come to me [asking for supplies]. I'm the PI (primary investigator) on that." Dr. Sammond

responded that she had copied him on the emails requesting materials for this work, and repeatedly received no answer.

21. Shortly after this discussion, Decker questioned the review itself, saying, "Obviously there is something going on here…[this] doesn't make any sense to me on any level…it doesn't make any sense." He concluded that, "obviously we can't upload this," meaning that the review could not be officially submitted to human resources. Dr. Sammond then discussed bringing her concerns to human resources. Crowley discouraged her, saying, "Oh no…that's our problem."

22. That same month, Dr. Sammond provided her written rebuttal to Himmel's 2017 review, documenting its numerous inaccuracies and falsehoods. Defendant's written policies in effect at the time required that employees' performance reviews be included in their personnel files, along with the employee's rebuttal. This inclusion is important, because under Defendant's policies reviews "primarily contribute[] to an individual's eligibility for a merit increase" in pay. Despite these clear policies, Defendant did not place Ms. Sammond's 2017 review in her personnel file. Unlike 2017, when it increased her pay at the beginning of the year, in 2018 Defendant did not grant her any type of pay increase.

23. In approximately the same timeframe, James Martin, Defendant's in house attorney, called Dr. Sammond's attorney requesting a settlement demand, and indicating that as a condition of any resolution Defendant would require Ms. Sammond to leave her job. Dr. Sammond declined. Concurrently, Defendant

concluded its investigation of her discrimination and retaliation complaints, but did not provide Dr. Sammond with a copy of its findings.

24. In early 2018, Dr. Sammond filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD"), accusing Defendant of sex discrimination and retaliation and specifically accusing Himmel and Bomble of illegal actions against her.

25. Contemporaneously, in a claimed attempt to remedy the situation and give her a "fresh start," Defendant assigned Dr. Sammond a new set of tasks, but did not guarantee her funding to ensure her continued employment. Additionally, Defendant continued to allow Crowley to supervise her work, despite his involvement in presenting Himmel's retaliatory 2017 review, and the two men's friendship. Defendant further allowed Bomble to supervise her work despite his close ties to Himmel, and the fact that he was personally identified in her CCRD charge as participating in discriminatory and retaliatory acts against her. Defendant also kept her at the same desk, in close physical proximity to Himmel and Bomble. Defendant took these actions despite the fact that it is a massive organization with over 2000 employees and could have easily moved her and placed her under the supervision of scientists untainted by allegiance to Himmel or previous allegations of discriminatory and retaliatory conduct.

26. Not surprisingly, the "fresh start" was nothing of the sort, and Crowley ruthlessly criticized Dr. Sammond's work throughout the first half of 2018. On approximately July 12, she met with one of her supervisors, to discuss her frustration at having to continue to work with Crowley and Bomble, and

10

concerns of ongoing discrimination and retaliation. She explained that she believed that Crowley, in particular, was setting her up to fail. Upset, her supervisor responded by telling her to forget the past, and that she would be treated like a brand-new employee—despite the fact that she had been working for Defendant for eight years.

27. On August 17, 2018, through a letter from her attorney, Dr. Sammond informed Defendant about additional retaliation. She also amended her CCRD charge to make it explicit that Crowley had been partially responsible for the retaliatory 2017 review, and was continuing this retaliation through unrealistic performance expectations.

28. On August 22, Dr. Sammond met Defendant's human resources representative, Deb Coyle, and told her about her ongoing concerns of discrimination and retaliation by Crowley. Ms. Coyle responded by revealing that she had previously recommended that Dr. Sammond not be required to continue to work under Mr. Crowley, and that she had recommended that Dr. Sammond's desk be moved. Ms. Coyle then asked Dr. Sammond if she would like her desk moved, and she responded that she would.

29. Throughout 2018, Defendant continued to assign Dr. Sammond tasks, but often required that she could not use Rosetta, allegedly because of funding restrictions. However, because Dr. Sammond is the only Rosetta scientist working for Defendant, this restriction appeared to be targeted specifically at her. Frustrated, on October 26, 2018, she met with Defendant's Director, Martin Keller, and informed him that she was experiencing continued retaliation

through the withholding of funds and being forced to continue to work under Crowley. He responded with surprise, stating that Defendant was very successful raising funds, and that with 2000 employees in the lab, it should have been easy to allow Dr. Sammond to work with other people, away from the influence of Himmel, Bomble, and Crowley.

30. On October 30, 2018, Discover magazine ran an article about Rosetta calling it "the single most important tool" in protein research and design.[3] At approximately that same time, a University contacted Dr. Sammond asking for her help in a faculty search and calling her a "leader in protein design," a reputation she gained primarily through her Rosetta work. Later that month, she was featured in an article for phys.org positively discussing her Rosetta work. Nevertheless, on November 5, Defendant assigned her additional tasks, with the express stipulation that she could not use Rosetta.

31. On November 28, 2018, Defendant gave Dr. Sammond an unfavorable performance review, largely based on the input of Crowley and Bomble. She continues to work under their supervision, and in close proximity to Bomble and Himmel.

32. On February 22, 2019, the Colorado Civil Rights Division completed its investigation of Dr. Sammond's claims and determined that there was probable cause to conclude that Defendant illegally retaliated against her because of her

---

[3] http://discovermagazine.com/2018/nov/all-in-the-fold

complaints of sex discrimination. In response to the State of Colorado's finding that Defendant had illegally retaliated, it took no remedial action, but instead requested that she resign.

## FIRST CAUSE OF ACTION
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT
## 42 U.S.C. § 2000e *et seq.*

33. As a woman, Dr. Sammond is a member of a protected class.

34. Dr. Sammond suffered adverse action in the form of Defendant's refusal to promote her or grant her raises.

35. Defendant's animus towards women was a motivating factor in the adverse actions.

36. Defendant had no legitimate, non-discriminatory reasons for the adverse actions it took against Dr. Sammond.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT
## 42 U.S.C. § 2000e *et seq.*

37. Dr. Sammond engaged in protected activity by complaining about sex discrimination and filing a CCRD Charge.

38. Defendant took adverse action against Dr. Sammond by refusing to promote her, refusing to give her raises, giving her negative performance reviews, and setting her up to fail.

39. There was a causal connection between Dr. Sammond's protected activity and Defendant's adverse actions against her.

40. Defendant had no legitimate, non-discriminatory reasons for the adverse actions it took against Dr. Sammond.

### THIRD CAUSE OF ACTION
### SEX DISCRIMINATION IN VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT
### C.R.S. 24-34-301, *et seq.*

41. As a woman, Dr. Sammond is a member of a protected class.

42. Dr. Sammond suffered adverse action in the form of Defendant's refusal to promote her or grant her raises.

43. Defendant's animus towards women was a motivating factor in the adverse actions.

44. Defendant had no legitimate, non-discriminatory reasons for the adverse actions it took against Dr. Sammond.

### FOURTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT
### C.R.S. 24-34-301, *et seq.*

45. Dr. Sammond engaged in protected activity by complaining about sex discrimination and filing a CCRD Charge.

46. Defendant took adverse action against Dr. Sammond by refusing to promote her, refusing to give her raises, giving her negative performance reviews, and setting her up to fail.

47. There was a causal connection between Dr. Sammond's protected activity and Defendant's adverse actions against her.

48. Defendant had no legitimate, non-discriminatory reasons for the adverse actions it took against Dr. Sammond.

**DEMAND FOR JUDGMENT**

Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award him all relief as allowed by law, including, but not limited to, the following:

a. Actual economic damages as established at trial;

b. Compensatory damages including, but not limited to, those for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

c. Punitive damages;

d. Pre-judgment and post-judgment interest at the statutory rate;

e. Attorneys' fees, costs and expenses; and

f. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 9th day of May, 2019.

> s/ Paul Maxon
> Paul Maxon (Atty. Reg. # 37251)
> The Law Office of Paul Maxon, P.C.
> 4450 Arapahoe Avenue
> Boulder, CO 80303
> Telephone: (303) 473-9999
> Fax: (303) 415-2500
> E-mail: paulmaxon@maxonlaw.com
> Attorney for Plaintiff John Hayes